IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| SUE A. GRIESMAN, | ) | |
| | ) | |
| Plaintiff, | ) | 8:04CV3359 |
| | ) | |
| vs. | ) | |
| | ) | |
| JO ANNE B. BARNHART, | ) | MEMORANDUM AND ORDER |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | | |

This is an action for judicial review of the final decision of the Commissioner of Social Security that plaintiff, Sue A. Griesman, is not disabled and, therefore, not entitled to disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 et seq., and 3181 et seq. Plaintiff filed her application for disability benefits on April 23, 2002, alleging that she became disabled on August 1, 2001, due to severe back and neck pain and migraine headaches. T.R. at 20-21, 83, 97, 124, and 550. The Social Security Administration denied the plaintiff's claim initially and on reconsideration. *Id.*

On March 31, 2004, plaintiff appeared with counsel and testified at a hearing before Administrative Law Judge ("ALJ") Jay Levine. T.R. at 530. On June 2004, ALJ Levine denied the plaintiff's claim. T.R. at 20. On September 21, 2004, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review. T.R. at 8-10. Pursuant to 42 U.S.C. § 405(g), plaintiff initiated this civil action for judicial review of the Commissioner's final decision.

**A. Plaintiff's Testimony**

Plaintiff was 35 years old at the time of the ALJ's decision on March 31, 2004. T.R.

at 533. She testified that she has a high school education and that she worked as a waitress, bartender, and cook from 1987 to 1989. T.R. at 534-35. She also testified that, after she graduated from high school, she occasionally worked as a childcare provider. *Id.* She also worked as a housekeeper during 1990 or 1991. *Id.* Plaintiff testified that she has not been employed since sometime in 2001 when she worked at a public daycare. *Id.* Plaintiff's testimony indicates that she stopped working because of problems with her back and because she had a uterine fibroid tumor. *Id.* Plaintiff also testified that, in November of 2001, she was involved in a car accident. T.R. at 536. Plaintiff stated that she was unemployed at the time of her hearing because she could not lift or bend due to her back problems. T.R. at 538. She stated that she has constant lower back pain with numbness running down the back of her legs to the bottom of her feet. *Id.* Plaintiff stated that the car accident accelerated her back problems and led to more numbness in the back of her legs, more trouble with the left leg, and constant pain. *Id.*

     Plaintiff testified that her doctors recommended physical therapy for six months. T.R. at 539. Plaintiff stated that the physical therapy helped somewhat. *Id.* She indicated that after the car accident she could not use her left leg. *Id.* Plaintiff stated that physical therapy helped her left leg, but it did not help her back. *Id.* Plaintiff stated that prolonged sitting and standing aggravates her pain. T.R. at 540-43, 549. She stated that she could stand for only one-half hour before she needs to sit for one-half hour. *Id.* She stated that she sits for only one-half hour at a time in an upright position before having to stand and before her legs become numb. *Id.* Plaintiff stated that she needs to lay on her side every other hour for one-half hour to relieve pressure from her lower back. *Id.* Plaintiff testified

that the heaviest object she could lift is a gallon jug of milk, that she cannot bend fully at the waist, and she cannot crouch, squat, or climb stairs on a regular basis. *Id.* Her ability to use her arms or hands is not affected or limited, and she has no problems with personal habits such as bathing and dressing. *Id.* Plaintiff uses a cane most of the time. *Id.* Plaintiff testified that she took OxyContin, Hydrocodone, and a muscle relaxer to control her pain. *Id.* Plaintiff is not aware of any side-effects with respect to these medications. *Id.*

During a typical day, plaintiff stated that she woke up at 7:00 a.m., made breakfast and coffee, watched television, rested in a chair, and put ice on her back. T.R. at 543-47. She then moved around a little bit, watched more television, rested on the couch or chair, made dinner, washed dishes, read, and sat in the chair with ice on her back. *Id.* Plaintiff occasionally went to a friend's house to visit. *Id.* She shopped with her family so they could assist her by retrieving items from low shelves and by lifting heavy items. *Id.* The plaintiff's hobbies included "rubber-stamping," that is, making greeting or sympathy cards twice per week for about one-half hour each time. *Id.* She was also involved in the "red hat society" in which women get together once a month to have tea and listen to speakers talk about a variety of subjects. *Id.*

**B. Vocational, Psychological, and Medical Evidence**

In November, 1994, a vocational evaluation indicated that the plaintiff had limitations in reading comprehension, language mechanics, and arithmetic skills, but it noted that the plaintiff performed well in a variety of work-related situations in child care services and did well in several practice sessions in checker-cashier activity. T.R. at 400-06. In July, 1996,

a psychological report by John J. Curran, Ph.D., indicated that plaintiff had a below average intellectual functioning, indicating a diagnosis of borderline intellectual functioning. T.R. 193-98. The Wechsler Adult Intelligence Scale-Revised administered to the plaintiff indicated a verbal IQ of 80, a performance IQ of 78, and a full scale IQ score of 77. *Id.* A work performance assessment from Helping Hands Child Care indicated that, from January through July, 2001, the plaintiff had been able to perform all the duties required of a childcare staff member. T.R. at 390-94.

In March and April, 2001, medical records from Dr. C. Robert Adams indicated that the plaintiff had been seen for complaints of pain, numbness, and weakness in the right arm, persistent headaches, and peptic acid disease. T.R. at 201-05. Dr. Adams diagnosed and treated plaintiff for tendonitis with some carpal tunnel symptoms on the right wrist, but this condition improved with medication, diet and exercise. *Id.* An examination on June 25, 2001, showed good range of motion in the bilateral arms and neck. *Id.* The plaintiff's headaches also improved with medication. *Id.*

On September 11, 2001, the plaintiff went to the Boone County Health Center because she had severe back pain with numbness in her bilateral legs. T.R. 210. Examination findings revealed muscle tone within normal limits, steady balance and gait, and that plaintiff could move all extremities freely. *Id.* At the health center, doctors diagnosed plaintiff with lumbosacral strain with sciatica. *Id.*

On September 18, 2001, Dr. William F. Becker saw the plaintiff for complaints of severe back pain and he noticed that the plaintiff could not walk or lift her legs. T.R. at 384. However, a Magnetic Resonance Imaging (MRI), performed during the same month,

4

showed mild L5-S1 disc bulging with no evidence of nerve root compromise. T.R. at 257. The MRI also showed evidence of a large uterine fibroid tumor which caused plaintiff pelvic pain. *Id.* In October 2001, the plaintiff underwent a total abdominal hysterectomy and bilateral salpingo-oophotectomy to remove the pelvic mass. T.R. at 334.

On October 5, 2001, a medical examination of the plaintiff indicated a moderately limited lumbosacral range motion and straight leg rising maneuver of 45 degrees on the right, but negative on the left. T.R. at 224. However, on November 2, 2001, an examination revealed negative straight leg rising, negative Lasegue's test, and negative figure-of-four test. T.R. at 370.

On November 27, 2001, the plaintiff was involved in a motor vehicle accident. T.R. at 328. As a result of this accident, the plaintiff experienced more pain in her back, neck, left shoulder, chest, and left knee. T.R. at 248. However, diagnostic examination revealed no abnormalities in her left shoulder, left clavicle, cervical spine, left lower leg, or pelvis. T.R. at 253-56. The plaintiff had a very mild disc space narrowing at the L5-S1 level but otherwise a normal lumbar spine. *Id.*

On December 3, 2001, an examination of the left knee revealed no abnormalities. T.R. 367, 386. The examination noted no significant effusion and a neurovascular examination within normal limits. *Id.*

On February 28, 2002, progress notes indicated plaintiff's knee to be slowly improving with physical therapy and trans-electrical nerve stimulation, but plaintiff reported that she developed lower back pain from the intense physical therapy she had received. T.R. at 273-74. The progress notes, however, indicated that plaintiff showed no radicular sign or complained of radicular pain. *Id.* The plaintiff had to take a low-dose tricyclic

antidepressant at bed time to help her sleep.  T.R. at 320.

On March 19, 2002, an MRI of the lumbar spine showed a very small central disc protrusion at L5-S1 of questionable significance and evidence of early degenerative disc disease at L4-5 and L5-S1 with mild bilateral facet arthropathy at each of these levels. T.R. at 323-24. An MRI of the cervical spine showed a very mild central disc bulging at both C4-5 and C5-6 of questionable significance.  *Id.*  The MRI also showed a slight straightening of the normal lordotic curve in the mid-cervical spine, possibly related to muscle spasms or positioning.  *Id.*

On April 8, 2002, the plaintiff underwent electrophysiologic studies of the left arm and left leg.  T.R. at 281-82.  These studies showed essentially normal results with minimal change across the carpal tunnel on the left with no striking evidence of peripheral entrapment.  *Id.*  These studies showed no cervical radiculopathy, plexopathy, or myopathy.  *Id.*

On April 25, 2002, the plaintiff underwent an epidural steroid injection, but she reported that the injection did not help to relieve her pain.  T.R. at 320.

On July 15, 2002, the plaintiff underwent a consultative psychological evaluation by Dr. Curran.  T.R. at 408-17.  Dr. Curran indicated that plaintiff had some symptoms of depression, but that her depression did not reach the level of a major depressive disorder. *Id.*  Dr. Curran also asserted that the plaintiff had a pain disorder associated with both psychological factors and a chronic medical condition and that she has borderline intellectual functioning.  *Id.*  Dr. Curran indicated that plaintiff had restrictions in activities of daily living due to her complaints of not being able to concentrate on tasks and

remember what she had to do each day.  *Id.*  The plaintiff reported to Dr. Curran that she could do some household chores and take care of her personal needs.  *Id.*  She reported that she could handle her own money and that she had been living in an apartment by herself for the past eight years.  *Id.*  Dr. Curran also asserted that plaintiff had limitations in maintaining a social life because she is shy.  *Id.*  The plaintiff, however, told Dr. Curran that, in the past, she could hold two jobs at the same time.  *Id.*

Dr. Curran asserted that plaintiff did not have the ability to carry out short and simple instructions under ordinary supervision.  *Id.*  Dr. Curran, however, noted that plaintiff knew that Mr. Bush is the president, she knew Mr. Clinton had been president, and she also knew the name of the vice president and the governor of Nebraska.  *Id.*  Plaintiff could adequately identify one current event in the news and she could count backwards from 20 in 41 seconds, and she did it correctly.  *Id.*  She correctly recited the alphabet in 52 seconds and she did serial threes.  *Id.*  Dr. Curran noted that plaintiff could only remember two of three words over a five minute time span.  *Id.*  Dr. Curran also noted that plaintiff could correctly add two plus three, multiply three times four, divide eight by two, and subtract three from seven.  The plaintiff knew the similarities between an orange and a banana, a dog and a lion, a table and a chair, and a poem and a statue.  *Id.*

On August 23 and 24, 2002, a State Agency Psychiatric Review indicated that plaintiff suffers from an affective disorder secondary to her physical impairments and pain symptoms and that she has mild restrictions in activities of daily living and maintaining social functioning.  T.R. at 430-48.  However, despite these mild limitations, the plaintiff's review indicated that she is capable of relating appropriately and she is able to adequately

7

handle her daily responsibilities. *Id*. The plaintiff's review also indicated that her mental status examination did not reveal any significant cognitive compromise and that she is capable of performing a variety of work-related activities. *Id*.

On October 8, 2002, Dr. Joel A. Travis, plaintiff's treating physician, opined that the plaintiff is disabled due to her chronic neuropathic pain. T.R. at 453. However, an MRI, also taken in October, 2002, showed no neurologic compressive lesions or disc protrusions and revealed only minimal disc degeneration with minimal bulge at L5-S1 and some mild facet arthropathy on the left L4-5. T.R. at 486.

On November 19, 2002, Dr. Geoffrey M. McCullen, an orthopedic surgeon, indicated that he had seen the plaintiff for complaints of back pain. T.R. at 464-75. Dr. McCullen did not find objective evidence of radiculopathy or that plaintiff required surgical intervention. *Id*. Dr. McCullen diagnosed plaintiff with chronic pain syndrome due to degenerative disease in the cervical and lumbar spine and that she suffered from disabling functional limitations as a result of her pain symptoms. *Id*.

On March 24, 2003, Dr. Travis referred the plaintiff for chiropractic treatment to manage her complaints of back pain due to "minimal disc degenerative disease" and indicated that plaintiff is "not able to afford most modalities to help treat this type of pain in terms of medications versus referrals and pain management clinics." T.R. at 478-80. On March 31, 2003, Dr. Travis indicated that plaintiff had minimal disc degenerative with chronic neuropathic pain with bilateral lower extremity radiculopathy. *Id*.

On March 5, 2004, Dr. Travis examined the plaintiff for complaints of lower back pain with bilateral lower extremity radiculopathy symptoms, as well as bilateral hand paresthesias, and he noted some tenderness in the cervical, thoracic, and lumbar spine

with decreased range of motion. T.R. at 489. Dr. Travis prescribed plaintiff OxyContin and Lortab for her pain symptoms and referred her for diagnostic testing. *Id.*

On March 11, 2004, the plaintiff underwent a consultative examination by Dr. Julius Sheppard for her physical complaints. T.R. at 502-09. An x-ray of the lumbar spine showed essentially normal results with the exception of scoliosis at L3, and an x-ray of the dorsal spine showed changes of scoliosis with some spurring and lipping at the apex of the dorsal curve. *Id.* An x-ray of the cervical spine showed essentially normal results with some loss of lordotic curve with no overt abnormality or shifting, and no obvious spurring or displacement. *Id.* Dr. Sheppard indicated the plaintiff suffered from lumbar scoliosis with secondary dorsal scoliosis and chronic strain of both the lumbar and the lumbodorsal region. *Id.* Dr. Sheppard also indicated the plaintiff suffered from resolving strain of her cervical region with no overt evidence of any knee or ankle residual problems. *Id.* Dr. Sheppard asserted the plaintiff could lift and/or carry 20 pounds frequently and 25 pounds occasionally. *Id.* Out of an eight-hour workday, the plaintiff could stand and/or walk for at least two hours and sit for less than six hours. *Id.* Dr. Sheppard stated that plaintiff's impairments did not affect her pushing and pulling ability. *Id.* He also stated that plaintiff could occasionally perform all postural activities with no restrictions in manipulative activities or environmental conditions. *Id.*

**C. Vocation Expert Testimony**

Thomas Odett, a vocational expert, testified at the hearing that the plaintiff's past work indicates that she worked in light and medium jobs. T.R. at 551-53. He indicated that the plaintiff's past work could be described as unskilled and semi-skilled. *Id.* The ALJ

9

asked the vocational expert whether jobs exist in the national economy for an individual of the plaintiff's age, education, past relevant work experience and residual functional capacity. *Id.* The vocational expert indicated that assuming the hypothetical individual's specific work restrictions, she is capable of making a vocational adjustment to other work. *Id.* The vocational expert testified that, given all of these factors, the claimant could work as a jewelry assembler, with 700 jobs in the regional economy and 60,000 to 70,000 jobs in the national economy, or she could bond semi conductors, with 1,200 jobs in the regional economy and 120,000 jobs in the national economy. *Id.*

### D. Standard of Review

A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423 (D)(1)(A); 20 C.F.R. § 404.1505. A claimant is considered to be disabled when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantially gainful work which exists in [significant numbers in] the national economy. . . ." 42 U.S.C. § 432 (D)(2)(A).

The ALJ evaluates a disability claim according to a five-step sequential analysis prescribed by Social Security regulations. The ALJ examines

> any current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and age, education and work experience. *See* 20 C.F.R. § 404.1520(a); *Braswell v. Heckler*, 733 F.2d 531, 533 (8th Cir. 1984). If a claimant suffers from an impairment that is included in the listing of presumptively disabling impairments (the Listings), or suffers from an impairment equal to such listed impairment, the claimant will be determined disabled without considering age, education, or work experience.

> *See Braswell*, 733 F.2d at 533.  If the Commissioner finds that the claimant does not meet the Listings but is nevertheless unable to perform his or her past work, the burden of proof shifts to the Commissioner to prove, first, that the claimant retains the residual functional capacity to perform other kinds of work, and second, that other such work exists in substantial numbers in the national economy.  *See Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). A claimant's residual functional capacity is a medical question.  *See id.* at 858.

*Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000).

When reviewing the decision not to award disability benefits, the district court does not act as a fact finder or substitute its judgment for the judgment of the ALJ or the Commissioner.  *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995).  Rather, the district court will affirm the Commissioner's decision to deny benefits if it is supported by substantial evidence in the record as a whole.  *Eback v. Chater*, 94 F.3d 410, 411 (8th Cir. 1996). "Substantial evidence is that which a reasonable mind would find as adequate to support the ALJ's decision."  *Brown v. Chater*, 87 F.3d 963, 964 (8th Cir. 1996) (*citing Baumgarten v. Chater*, 75 F.3d 366, 368 (8th Cir. 1996)). In determining whether the evidence in the record is substantial, the court must consider "evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).  If the record contains substantial evidence supporting the Commissioner's decision, the court may not reverse the decision either "because substantial evidence exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently."  *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000) (citations omitted).

**E. The ALJ's Decision**

On June 10, 2004, the ALJ issued a written decision finding that plaintiff had not engaged in substantial gainful activity since the alleged onset of disability.  T.R. at 29.  The

11

ALJ found that plaintiff's degenerative disc disease is a severe impairment.  *Id.*  The ALJ, however, determined that plaintiff's impairment did not meet or medically equal one of the listed impairments in the Regulations (Appendix 1, Subpart P, Regulation No. 4).  *Id.*  The ALJ also determined that the plaintiff's allegations regarding her limitations are not totally credible.  *Id.*  The ALJ found that, although plaintiff is not capable of performing any past relevant work, plaintiff had the residual functional capacity to perform a significant range of sedentary work.  *Id.*  The ALJ relied on vocational expert testimony in finding that plaintiff could perform a significant number of jobs in the economy.  *Id.*  Based on these findings and the vocational expert testimony, the ALJ concluded that plaintiff is not disabled as defined by the Social Security Act.  *Id.*

**F. Issues Presented for Review**

The issues presented for review by the plaintiff can be summarized as follows: (1) whether the ALJ failed to include all of the medically documented impairments and limitations in assessing the final residual functional capacity of the plaintiff; and (2) whether the ALJ properly determined the credibility of the plaintiff's subjective allegations of her physical and mental disabilities.  *See* Plaintiff's Brief at p. 11, Filing No. 13.  The court now turns to the examination of these issues.

**1. Did the ALJ fail to include all of the medically documented impairments and limitations in assessing the final residual functional capacity of the plaintiff?**

With respect to this issue, the plaintiff contends that the ALJ failed to consider the opinions of her treating physicians, Dr. Travis and Dr. McCullen, in assessing the plaintiff's residual functional capacity.  Specifically, the plaintiff contends that the ALJ failed to cite the medical opinions as a basis for discounting or rejecting the opinions of those doctors.

12

*See* Plaintiff's Brief at p. 13, Filing No. 13.  The court, however, does not agree with the plaintiff.

Residual functional capacity ("RFC") is that which a claimant is able to do despite his/her physical and mental limitations.  20 C.F.R. § 404.1545(a).  The ALJ considers the claimant's ability to lift weight, sit, stand, walk, push, pull, etc., in reaching this determination.  20 C.F.R. § 404.154(b).  The claimant's residual functional capacity is used to determine his/her ability to engage in various levels of work (sedentary, light, medium, heavy, or very heavy).  20 C.F.R. § 404.1567.  The determination of RFC is an issue reserved to the Social Security Administration.  *See* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2).  In determining what a claimant can do despite his or her limitation, the Social Security Administration must consider the entire record, including all relevant medical and non-medical evidence, such as claimant's assertions of what he or she is able or unable to do.  20 C.F.R. §§ 404.1545(a), 416.945(a).

In this case, the ALJ found that, although plaintiff is not capable of performing any past relevant work, plaintiff had the residual functional capacity to perform a significant range of sedentary work.  T.R. at 29.  The ALJ reached this determination considering all the medical evidence, including the medical records of Dr. Travis, Dr. McCullen and Dr. Curran, and by giving ample consideration to the plaintiff's subjective complaints.  T.R. at 25.

The plaintiff contends that the ALJ failed to consider the opinions of Dr. Travis and Dr. McCullen in assessing the plaintiff's residual functional capacity and that he failed to cite the medical opinions as a basis for discounting or rejecting their opinions.  However, the record indicates that the ALJ considered the opinions of these doctors.

13

In his decision, the ALJ noted that on October 8, 2002, Dr. Travis opined that the plaintiff is disabled due to chronic neuropathic pain. T.R. at 23, 453. However, the ALJ stated that an MRI taken in October 2002, showed no neurologic compressive lesions or disc protrusions and revealed only minimal disc degeneration with minimal bulge at L5-S1 and some mild facet arthropathy on the left L4-5. T.R. at 23, 486. The ALJ also noted that Dr. Travis first treated the plaintiff only three months prior to the date of his assessment. T.R. at 23, 456.

The ALJ further noted that the same month, October, 2002, Dr. McCullen indicated that plaintiff had chronic pain syndrome due to degenerative disease in the cervical and lumbar spine and that she suffered from disabling functional limitations as a result of her pain symptoms. T.R. at 24, 464-75. However, the ALJ found that Dr. McCullen had seen the plaintiff only twice and that he did not find objective evidence of radiculopathy or that plaintiff required surgical intervention. *Id.*

The ALJ also noted that, on March 24, 2003, Dr. Travis referred the plaintiff for chiropractic treatment to manage her complaints of back pain due to "minimal disc degenerative disease." T.R. at 478-80. The ALJ noted that Dr. Travis indicated that plaintiff's degenerative disease could develop into arthritis or a nerve impingement syndrome. *Id.* However, Dr. Travis also stated "at this point we have not seen that." *Id.*

The ALJ noted that, on March 5, 2004, approximately one year later, Dr. Travis again examined the plaintiff for complaints of lower back pain with bilateral lower extremity radiculopathy symptoms as well as bilateral hand paresthesias and that he noted there was some tenderness in the cervical, thoracic, and lumbar spine with decreased range of motion. T.R. at 489. However, the ALJ noted that, on March 11, 2004, after a consultative

examination by Dr. Sheppard, an x-ray of the lumbar spine showed essentially normal results with the exception of scoliosis at L3.  T.R. at 502-09.  An x-ray of the cervical spine showed essentially normal results with some loss of lordotic curve with no overt abnormality or shifting, and no obvious spurring or displacement.  *Id.*

In this case, the record indicates that the ALJ considered the opinions of Dr. Travis and Dr. McCullen in assessing the final residual functional capacity of the plaintiff and that he properly determined they could not be supported by the objective medical evidence. This objective medical evidence included, among other things:

> (1) an MRI in September 2001, which showed mild L5-S1 disc bulging and no evidence of nerve root compromise.  T.R. at 257;
>
> (2) an MRI, taken in March 2002, of the plaintiff's lumbar spine which showed a very small central disc protrusion at L5-S1 of questionable significance and evidence of early degenerative disc disease at L4-5 and L5-S1 with mild bilateral facet arthropathy at each of these levels.  T.R. at 323-24;
>
> (3) an MRI of the cervical spine that showed a very mild central disc bulging at both C4-5 and C5-6 of questionable significance and slight straightening of the normal lordotic curve in the mid cervical spine, possibly related to muscle spasms or positioning.  Id;
>
> (4) Electrophysiologic studies, in April, 2002, of the left arm and left leg, which showed essentially normal results with minimal change across the carpal tunnel on the left with no striking evidence of peripheral entrapment. T.R. at 281-82.  These studies, however, showed no cervical radiculopathy, plexopathy, or myopathy.  Id;
>
> (5) an MRI taken in October 2002, which showed no neurologic compressive lesions or disc protrusions and revealed only minimal disc degeneration with minimal bulge at L5-S1 and some mild facet arthropathy on the left L4-5. T.R. at 23, 486; and
>
> (6) x-rays of the lumbar spine and the cervical spine, taken in March 2004, which showed essentially normal results. T.R. at 502-09.

The plaintiff's contention that the ALJ failed to consider the opinions of Dr. Travis and Dr.

McCullen in assessing her residual functional capacity, and that he failed to cite the medical opinions as a basis for discounting or rejecting the opinions of those doctors, is without merit. While the ALJ did not expressly comment on every piece of medical evidence as to how it compares to the opinions of Dr. Travis and Dr. McCullen, he clearly considered all the objective relevant medical evidence in rejecting their opinions.

The plaintiff also contends that the ALJ failed to consider the opinion of Dr. Curran in assessing the plaintiff's residual functional capacity. However, the record indicates that the ALJ considered the opinion of this doctor.

In his decision, the ALJ noted that in July, 1996, a psychological report by John J. Curran diagnosed plaintiff with borderline intellectual functioning. T.R. 193-98. He noted that plaintiff scored a verbal IQ of 80, a performance IQ of 78, and a full scale IQ score of 77. *Id.* However, the ALJ noted that a work performance assessment from Helping Hands Child Care indicated that from January through July, 2001, the plaintiff could perform all the duties required of a childcare staff member. T.R. at 390-94.

The ALJ also noted that on July 15, 2002, the plaintiff underwent another consultative psychological evaluation by Dr. Curran. T.R. at 408-17. On that evaluation, Dr. Curran indicated that plaintiff had some symptoms of depression, but that her depression did not reach the level of a major depressive disorder. *Id.* Dr. Curran also asserted that the plaintiff has a pain disorder associated with both psychological factors and a chronic medical condition and that she has borderline intellectual functioning. *Id.* Dr. Curran asserted that plaintiff had restrictions in activities of daily living due to complaints of not being able to focus and concentrate on tasks. *Id.*

The plaintiff, however, reported to Dr. Curran that she could do some household

chores and take care of her personal needs. *Id.* Plaintiff could handle her own money and she had been living in an apartment by herself for the past eight years. *Id.* The plaintiff told Dr. Curran that, in the past, she could hold two jobs at the same time. *Id.* Plaintiff could adequately identify one current event in the news and she could count backwards from 20 in 41 seconds, and she did it correctly. *Id.* The plaintiff correctly recited the alphabet in 52 seconds and she did serial threes. *Id.*

In addition, the ALJ also noted that, on August 23 and 24, 2002, a State Agency Psychiatric Review indicated that: (1) plaintiff has mild restrictions in activities of daily living and maintaining social functioning; (2) plaintiff is capable of relating appropriately and she is able to adequately handle her daily responsibilities; and (3) plaintiff is capable of performing a variety of work-related activities. T.R. at 430-48.

The plaintiff's contention that the ALJ failed to consider the opinion of Dr. Curran in assessing her residual functional capacity, and that he failed to cite the medical opinion as a basis for discounting or rejecting the opinion of that doctor, is without merit.

**2. Did the ALJ properly determine the credibility of the plaintiff's subjective allegations of her physical and mental disabilities?**

With respect to this issue, the plaintiff contends that the ALJ improperly evaluated the plaintiff's credibility. The court disagrees. The framework for considering a plaintiff's credibility or subjective allegations is set forth in *Polaski v. Heckler,* 739 F.2d 1320 (8th Cir. 1984). Under this framework, the ALJ accepts the subjective allegations of a claimant unless inconsistencies or other evidence diminishing the credibility of the claimant are present in the record. *Polaski,* 739 F.2d at 1321-22. While the lack of medical evidence is not dispositive to the question of a claimant's credibility, it is an important factor. *Kisling*

*v. Chater,* 105 F.3d 1255, 1257-58 (8th Cir. 1997). The issue is not whether the claimant actually experiences the subjective complaints alleged, but whether those symptoms are credible to the extent they prevent the claimant from performing substantial gainful activity. *Baker v. Apfel,* 159 F.3d 1140, 1145 (8th Cir. 1998). The Commissioner may discount subjective complaints where there are inconsistencies in the medical evidence in the record as a whole, or where the credibility of the claimant is diminished by inconsistencies or other evidence. *Kisling,* 105 F.3d at 1257-58.

In his decision, the ALJ determined that the objective medical evidence is inconsistent with a finding of disability. T.R. at 26. The court agrees with the ALJ's determination. The allegations of the plaintiff, with regard to her limitations, are inconsistent with the medical evidence. As the ALJ noted and as stated above in this opinion, the medical objective evidence (which includes MRI's, X-rays, and psychological evaluations) do not indicate that plaintiff has any significant neurological, psychological or physical limitation. T.R. at 257; 281-82; 323-24; 408-17; 430-48; 486; 502-09. Here, the ALJ found that plaintiff can perform sedentary work and there is substantial evidence in the record to support that finding.

The plaintiff also takes issue with the fact that one page of the transcript of the hearing is missing. *See* Plaintiff's Brief at pp. 16-17, and 19, Filing No. 13. The plaintiff asserts that this page contains his cross examination of the vocational expert and that, without it, the court cannot properly determine whether the ALJ's decision is supported by substantial evidence. The court again disagrees with the plaintiff.

As previously stated, if the claimant is unable to perform past work, the burden shifts to the Commissioner to prove there are other jobs in the national economy that the

claimant can perform. 20 C.F.R. § 404.1520; *Simmons v. Massanari,* 264 F.3d 751, 754-55 (8th Cir. 2001). The vocational expert's testimony is relevant to the determination of the Commissioner's analysis of whether a claimant with a severe impairment has the residual functional capacity to do past relevant work or other work available in the national economy. *Gilbert v. Apfel,* 175 F.3d 602, 604 (8th Cir. 1999). Hypothetical questions posed to vocational experts should precisely set out the claimant's particular physical and mental impairments. *Roberts v. Apfel,* 222 F.3d 466, 471 (8th Cir. 2000). Testimony obtained from a hypothetical question must relate all of a claimant's impairments in order to constitute substantial evidence to support the Commissioner's decision. *Montgomery v. Shalala,* 30 F. 3d 98, 100 (8th Cir. 1994).

Here, the ALJ properly accounted for plaintiff's impairments when he posed the hypothetical question to the vocational expert. T.R. at 21. The ALJ found that the plaintiff is restricted to sedentary work. *Id.* The ALJ determined that plaintiff could lift and/or carry 10 pounds occasionally and frequently. *Id.* The ALJ determined plaintiff's pushing and pulling ability to be consistent with the sedentary exertional restrictions. *Id.* The ALJ determined that plaintiff is able to perform occasional stooping, kneeling, and crouching. *Id.* He determined that the plaintiff is precluded from climbing, balancing, crawling, and working around unprotected heights, dangerous machinery, or temperature extremes and that she was precluded from working around vibrations. *Id.* Based on these restrictions, the ALJ asked a hypothetical question to the vocational expert as to whether jobs existed in the national economy for someone with such restrictions. T.R. at 551-53. The vocational expert then indicated that, assuming the hypothetical individual's specific

restrictions, the claimant could work as a jewelry assembler, with 700 jobs in the regional economy and 60,000 to 70,000 jobs in the national economy, or she could bond semi conductors, with 1,200 jobs in the regional economy and 120,000 jobs in the national economy.  *Id.*

The court determines that the claimant's impairments, determined by the ALJ, are supported by substantial evidence, and that the vocational expert's testimony, obtained from a hypothetical question, related to those impairments.  Therefore, the testimony obtained from the vocational expert constitutes substantial evidence which supports the Commissioner's decision.  *Montgomery,* 30 F. 3d at 100.  The fact that a page is missing from the transcript does not change or contradict the ALJ's findings in anyway.

THEREFORE, IT IS HEREBY ORDERED that the findings and conclusions of the ALJ are affirmed and this case is dismissed.  A separate judgment will be entered in accordance with this memorandum and order.

DATED this 21st day of March, 2006.

                                       BY THE COURT:


                                       s/Joseph F. Bataillon
                                       JOSEPH F. BATAILLON
                                       United States District Judge